## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 99-14040-CR-MOORE/LYNCH

UNITED STATES OF AMERICA,

       **Plaintiff,**

v.

**JAVAR WYCHE,**

       **Defendant.**

_____/

FILED by ____ D.C.

DEC - 9 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### REPORT AND RECOMMENDATION ON SUPERSEDING
### PETITION FOR OFFENDER UNDER SUPERVISION [D.E. #105]

**THIS CAUSE** having come on to be heard for a final evidentiary hearing on November 16, 2011 in respect to the aforementioned Superseding Petition and this Court having conducted an evidentiary hearing on that date and concluding the evidentiary hearing on December 7, 2011, makes the following recommendation to the District Court:

      1.    At the outset of the evidentiary hearing, counsel for the government announced that Violation Number 1 and Violation Number 3 set forth in the Superseding Petition signed by Judge Moore on October 26, 2011 would be dismissed by the government. The government announced that it would be proceeding only in respect to Violation Number 2 of the Superseding Petition which charges the Defendant with the following violation:

| | |
|---|---|
| **Violation Number 2** | **Violation of Mandatory Condition**: by failing to refrain from violation of the law. On or about September 27, 2011 in St. Lucie County, Florida, the defendant did commit disturbing the peace, contrary to Florida Statute 877.03. |

2.      The first witness called by the government was Deputy Mangrum of the St. Lucie County Sheriff's Office.  Deputy Mangrum was on duty at the St. Lucie County Courthouse on September 27, 2011 in his capacity as a court security officer.  Deputy Mangrum previously worked as a road patrol deputy with the St. Lucie County Sheriff's Office and within the last two months has been working for the St. Lucie County Sheriff's Office as a court security officer at the St. Lucie County Courthouse in downtown Fort Pierce.  On that date, he encountered the Defendant, who he identified in open court at this hearing.

3.      On that date, Deputy Mangrum and Deputy Rullo were acting as court security officers on the second floor of the courthouse in County Judge Yacucci's courtroom. As Judge Yacucci entered the courtroom everyone in the courtroom was asked to rise.  Deputy Mangrum noted that the Defendant and another individual seated near the Defendant did not stand.  Deputy Mangrum's partner, Deputy Rullo, was observed going over and talking to the Defendant and this other individual.  Deputy Mangrum testified that the Defendant continued to refuse to stand and only "half-stood" eventually.

4.      Deputy Mangrum was not close enough to overhear what Deputy Rullo was discussing with the Defendant and the other individual who had initially refused to stand. Deputy Mangrum observed the Defendant make what he termed to be an aggressive move toward Deputy Rullo and also heard profanity coming from the Defendant.  He also overheard the Defendant say something about a lawsuit.

5.      Deputy Mangrum talked with Deputy Rullo who told him that he had talked with the Defendant about standing up.  After some confrontation with the Defendant, both the Defendant and two other individuals were asked to step outside of the courtroom.

6.      Once the Defendant, the other two individuals, Deputy Mangrum and Deputy Rullo were in the outer hallway, the Defendant said that he did not have a hearing there. This was in response to inquiries by the deputies.  Since the Defendant and the other two individuals with him indicated they did not have a court case requiring their appearance, the deputies asked all three to leave the courthouse.

7.      Deputy Mangrum testified that the Defendant then asked what if he did not leave.  Deputy Mangrum told the Defendant that he would be escorted out if he did not leave on his own.  Deputy Mangrum and other deputies then escorted the Defendant and the other two individuals out the front door of the courthouse.  Deputy Mangrum testified that it was there that the Defendant stopped and yelled profanities loud enough that Deputy Mangrum then walked from inside the courthouse outside and told the Defendant to leave. Deputy Mangrum stated that the Defendant threatened him by saying that the Defendant knew where Deputy Mangrum worked and would get him.  Deputy Mangrum told the Defendant to stop and then everyone left the area.

8.      Deputy Mangrum stated that he may have had contact with the Defendant previously while working on road patrol, but he did not know the Defendant by name.  This contact was in respect to a disturbance and happened within the past two years.  He was not specific as to the time or place.

9.      When the incident initially took place inside Judge Yacucci's courtroom, Deputy Mangrum was approximately fifteen feet away from where the Defendant was seated. Deputy Rullo was the individual speaking with the Defendant at that time.  By the time Deputy Rullo engaged the Defendant and the other individuals in conversation, everyone had already been seated and court had begun.  In speaking with Deputy Rullo,

3

Deputy Mangrum learned that he was trying to find out why the Defendant did not stand. Deputy Mangrum saw the Defendant pointing to his ears and thought that maybe he had a hearing problem or a problem understanding the instructions to stand.

10.     Deputy Mangrum testified that when the Defendant and the other two individuals were asked to exit the courtroom, that he saw the Defendant stand and make a "grilling" or "growling" action with his face. Deputy Mangrum said that at the same time he observed the Defendant make movements toward Deputy Rullo. Deputy Rullo was leaning over the bar of the court into the visitors section where the Defendant and the other two individuals were seated in the second row of chairs. Apparently that courtroom has chairs as opposed to pews. Deputy Mangrum testified that he saw the Defendant get out of the chair and move forward towards Deputy Rullo which Deputy Mangrum interpreted to be an aggressive move.   It does not appear that there was any contact between the Defendant and anyone else in the courtroom.

11.     Deputy Mangrum stated that the other two individuals did not make any such "aggressive" movements and simply stood up in a normal motion. They all then exited the courtroom as referenced previously herein by this Court. One of the other two individuals with the Defendant also had failed to stand when asked to do so when Judge Yacucci entered the courtroom. It was later determined that the other individuals were Mr. Lampkin and Mr. Banks. Deputy Mangrum stated that Mr. Banks was never a problem and that Mr. Lampkin was the other individual with the Defendant who refused to stand initially. Deputy Mangrum estimated that the entire incident in the courtroom took about a minute before everyone was escorted out to the hallway on the second floor.

12.     The Defendant and the other individuals were asked if they had a case in the courtroom.  They indicated that no they did not, but they were there for a family member who had a case.  This was all explained to Deputy Rullo.  Once it was determined that they were not required to be in court for a case of their own, all three individuals were asked to leave the courthouse.  Deputy Mangrum characterized the Defendant as having a "negative attitude" more than Deputy Mangrum is used to seeing from individuals who may be displeased by having to be at the courthouse or displeased with a particular result involving a case at the courthouse.

13.     Deputy Mangrum stated on cross-examination that as they were all walking to the elevator to go to the first floor, the Defendant asked what if he did not agree to leave the courthouse.  Deputy Mangrum stated that this was stated by the Defendant loudly enough to be disruptive to the other people in the area.  It was pointed out that his report did not mention any specific disruptive behavior.  However, Deputy Mangrum explained on several occasions on cross-examination that his report was not all-inclusive.  He prepared the narrative but there are other portions of the report such as in the header which contain information given by other individuals and not him.

14.     Once all of the individuals were in the elevator, Deputy Mangrum stated that the Defendant took an "aggressive stance."  Deputy Mangrum stated that the Defendant was told that any such action or threats would not be tolerated.  This was not placed in his report either.  Once the Defendant was taken to the front door on the first floor and went outside, Deputy Mangrum remained inside the courthouse.  He could hear and see the Defendant yelling profanities outside the courthouse.

5

15.     Deputy Mangrum walked outside and told the Defendant several times to leave the area.  He observed the Defendant make it to the end of the sidewalk at Second Street where the courthouse is located.  It was there that Deputy Mangrum observed the Defendant say that he knew where Deputy Mangrum worked and that he would "get mine."

16.     Deputy Mangrum spoke with Mr. Lampkin who gave him the name of Tony Smith as purportedly being the Defendant's real name.  An anonymous call later came in to the sheriff's office and identified that individual who Deputy Mangrum had a confrontation with as being this Defendant, Javar Wyche.

17.     After completing his narrative, the information was turned over to a detective at the St. Lucie County Sheriff's Office who then referred it to the State Attorney's Office. There are pending charges of disorderly conduct with the State.  Deputy Mangrum testified that when he was preparing his report, he was not writing a report for seeking issuance of a warrant for resisting arrest or any other charge.  He was simply writing up a report concerning officer safety.

18.     Deputy Mangrum testified that Judge Yacucci was later advised as to what happened.  The judge stated that he did not see it and if he had he would have asked the individuals to be brought before him in the courtroom.  This was the sole witness for the government and it rested after presentation of Deputy Mangrum's testimony.

_____

19.     The Defendant called Roderick Lampkin as a witness.  Mr. Lampkin is the older brother of the Defendant.  On the date in question he was at the court along with the

6

Defendant and other individuals of his family to support his sister who was in jail and had a court case in Judge Yacucci's courtroom.

20.    As court started, the judge walked in and Mr. Lampkin said that the Defendant was "slow to rise."  It was then that a deputy came over and told he and the Defendant to stand up and get out of the courtroom.  The Defendant was seated next to Mr. Lampkin.  Mr. Lampkin testified that the Defendant simply stood up real slow because he has a bad foot.

21.    Mr. Lampkin stated that no one made any threatening or aggressive gestures towards anyone.  He does not know why they were told to leave the courtroom.  Mr. Lampkin apparently knows Judge Yacucci from other hearings according to his testimony and stated that if Judge Yacucci believed there was a problem, that he would have taken steps to take care of it right then.  Mr. Lampkin stated that the Defendant and he stood up within five to ten seconds before they were asked to leave the courtroom.

22.    Mr. Lampkin stated that the deputy got upset for no reason and was getting "all red" in the face.  Mr. Lampkin stated that the officer told him they had to leave and when asked why, they were told that they would be charged with trespassing if they did not leave.  Everyone then walked out of the courtroom to the elevator.  Mr. Lampkin testified that the Defendant did not use any profanity or threatening gestures.

23.    Mr. Lampkin stated that the Defendant, Deputy Mangrum, and another deputy and Mr. Lampkin were the only ones that got on the elevator.  Mr. Banks did not.  Once on the elevator, Deputy Mangrum cursed at them and called them "punks."  The Defendant purportedly told the deputies that they had no right to call them punks and it was

7

then that Deputy Mangrum began yelling at them outside the courthouse. This was after everyone had apparently left the courthouse according to Mr. Lampkin.

24.    The Defendant, while outside the courthouse, said that he was going to report Deputy Mangrum, and Deputy Mangrum told them all to leave. Deputy Mangrum told the Defendant and the other individuals that if they did not leave, they would be arrested for trespass. Mr. Lampkin then saw the Defendant walk to his car and leave.

25.    Another individual named Tony Smith was there for some reason unrelated to this incident or the court case for which the Defendant and his family were there at the courthouse. When asked who was yelling by Deputy Mangrum, Mr. Lampkin gave him the name of Tony Smith because it was Tony Smith who was yelling at Deputy Mangrum. Apparently the individuals outside the courthouse had told Tony Smith what had occurred and according to Mr. Lampkin, Tony Smith began yelling profanities. It is Mr. Lampkin's testimony that Deputy Mangrum is confusing the Defendant with Tony Smith and that is why he gave Deputy Mangrum the name of Tony Smith when asked who the person was who was yelling the profanities.

26.    Finally, when asked on cross-examination, Mr. Lampkin admitted that he has been convicted previously and received a twenty month prison sentence for possession of cocaine.

———————

27.    The Defendant re-called Deputy Mangrum to testify. Deputy Mangrum was firm in his understanding that it was the Defendant he observed causing the problem, yelling the profanities, and refusing to leave the courthouse. He did not mistake that

individual with Tony Smith. When asked as to what portions of his report identified the individual as 6' tall and not matching the description of the Defendant, Deputy Mangrum testified that the portion which was being read by counsel for the Defendant was put on there by someone else and was not part of his narrative report below. In pointing that out on the report which was utilized by both counsel at the hearing, Deputy Mangrum pointed out that in his narrative he correctly identified the Defendant as being 5'6" to 5'8" tall. He does not know who placed the 6' figure on the header portion of the computer printout which was the report utilized by counsel at this hearing.

_____

28.     At the conclusion of the hearing, this Court noted that during Deputy Mangrum's testimony, he alluded to a video of this incident either in the courtroom and/or outside in the hallway, elevator and downstairs. The government after consulting with Deputy Mangrum, confirmed that there is a video which had previously been copied and turned over to the Office of the State Attorney. This Court stated that based upon the divergent testimony it heard in court, that it wanted to view any and all video available of this incident whether it be from the courtroom, the elevator, the hallway, or the first floor of the courthouse.

29.     This Court thereafter set the conclusion of this hearing to be held on December 7, 2011, at the U. S. District Courthouse, Courtroom #4074, 101 South U. S. Highway 1, Fort Pierce, Florida. This Court further directed the parties to view any recordings of the incident and expects the government to provide defense counsel with a copy. If both parties stipulate to this Court viewing the recordings prior to the conclusion

9

of this hearing, they should file a written stipulation and provide a copy to this Court. Otherwise, this Court will anticipate that the recordings will be presented at the conclusion of the hearing as set by this Court.

_____

30.     On December 7, 2011, this Court conducted the conclusion of the final hearing at which time both the government and the Defendant stipulated to entry of Government's Exhibits No. 1 and 2, being two DVDs. Government's Exhibit No. 1 is a DVD containing the scene in Judge Yacucci's courtroom during which the alleged disorderly conduct began. Government's Exhibit No. 2 is a DVD which contains a view of four cameras simultaneously recording various areas at the St. Lucie County Courthouse. The scene in the upper lefthand corner is the hallway and elevator area outside Judge Yacucci's courtroom. Immediately below on the left is the scene of the first floor exit from that elevator. The bottom right scene is the front door exit of the County Courthouse. The upper right hand scene is the area immediately outside the doorway of the County Courthouse looking to the west towards Second Street. This Court points out that while viewing this exhibit, the viewer can click on any one of the cameras and expand them to the full screen.

31.     This Court viewed this evidence during the hearing and several times in Chambers after the conclusion of the hearing. This Court will attempt to set forth for the District Court, with as much specificity as possible, the relevant conduct of the Defendant as depicted on these two DVDs. As evidence, they are available for the District Court to view independent of this Court's recitations of what this Court finds to be relevant from these two DVDs.

32.    Government's Exhibit No. 1 depicts Judge Yacucci's courtroom.  The DVD begins at approximately 9:14 a.m.   The government alleges that the Defendant failed to stand when the judge entered the courtroom thereby precipitating a confrontation with the deputies/bailiffs in the courtroom. This begins at around 9:23 a.m. on the DVD counter. A court official is heard to announce Judge Yacucci onto the bench and requests everyone to stand.

33.    Counsel for the Defendant pointed out that the Defendant is wearing a red shirt throughout the videos contained in Government's Exhibits No. 1 and 2.   In Government's Exhibit No. 1, the Defendant appeared to be sitting in the second row of the gallery section just a couple of seats from the far right wall.  This would be to Judge Yacucci's right.  When the court official requests everybody to stand, it appears to this Court that the entire gallery, including the Defendant, does stand.  A deputy, which this Court assumes is Deputy Rullo, is seen approaching the area where the Defendant is seated as soon as Judge Yacucci begins his explanation of how the court would proceed.

34.    While Judge Yacucci can be heard on Government's Exhibit No. 1, there is no audio of the discussion between the Defendant and the deputy in the courtroom. Once the deputy is seen approaching the gallery area, the Defendant is seen to stand again and lean forward as if to speak to the deputy or hear what the deputy is saying to him.  At no time does it appear that the Defendant makes any hand gestures or aggressive movements towards that deputy.  The Defendant is sitting in what appears to be the second row with a partition between he and the deputy separating the well of the court from the spectator gallery area.  It appears as though the deputy was at least five to ten feet away from the Defendant during this period of time.

11

35.     Another deputy is seen coming to this same spectator gallery area where the Defendant is seated.  The Defendant and the individual identified as Mr. Lampkin, then immediately get up and walk out of the courtroom.  This Court did not observe any aggressive movements towards either deputy by the Defendant or Mr. Lampkin.  The Defendant and Mr. Lampkin are seen simply standing up and walking past the other individuals seated until they could get to the end of the row to exit the courtroom.  A third individual also follows from that same row and walks out of the courtroom from the spectator area as well.  This concludes all of the relevant evidence from Government's Exhibit No. 1.

36.     At approximately 9:28 a.m. according to the time counter on the DVD, the Defendant, Mr. Lampkin, and two deputies exit Judge Yacucci's courtroom.  This Court observed no aggressive conduct by any of the individuals, whether it be the Defendant, Mr. Lampkin, or either of the deputies.  There is no physical contact between any of the individuals either.  There appears to be some discussion between the deputies and this third individual who walked out of the courtroom with the Defendant and Mr. Lampkin.  This third individual may be Mr. Banks as identified by Mr. Lampkin during his testimony at the hearing.  Nevertheless, the two deputies, the Defendant, and Mr. Lampkin appear to talk for approximately one minute, then turn and walk towards the elevator on the second floor.  This Court did not observe any threatening gestures or contact by anyone all the way to the point when the two deputies, the Defendant, and Mr. Lampkin enter the elevator and the doors close.  The scene shows the Defendant walking towards the elevator ahead of the deputies with his hands behind his back.  This Court points out that there is no audio on any of the camera views on Government's Exhibit No. 2.

12

37.     The Defendant and Mr. Lampkin along with the deputies are then seen exiting the elevator on the first floor.  This Court does not see any threatening gestures, contact, touching, or any other aggressive behavior by any of the individuals whether that be the Defendant, Mr. Lampkin, or either of the deputies.  The Defendant and Mr. Lampkin walk out of the courthouse. The deputies initially stop at the exit and then continue outside following the Defendant and Mr. Lampkin. The Defendant and Mr. Lampkin walk continuously towards Second Street ahead of the deputies who are seen following them. There may have been words or discussions between the parties as they exited the courthouse, but the Court must rely upon the witnesses' recollections of what was said since there is no audio.  This Court observed no threatening gestures, swings, touchings, or any other non-verbal  actions by the Defendant, Mr. Lampkin, Deputy Mangrum or the other deputy as the four of them walked towards Second Street.

38.     As pointed out by counsel for the Defendant at the conclusion of the hearing, there are two individuals in that camera view who are wearing suits and speaking with each other as the Defendant, Mr. Lampkin and the deputies exited the courthouse.  These two individuals in suits stop and peer around a column to look down towards where the Defendant, Mr. Lampkin and the deputies were walking.  They watch for five to ten seconds and then return to where they were originally standing and continue their conversation.  This Court notes that there were other members of the public in this courtyard area  outside the County Courthouse, but none of those individuals appear to pay any attention to the Defendant, Mr. Lampkin or the deputies.  There does not appear to be any confrontation between any of member of the public and the deputies involved in this matter.

13

39.     The Court loses the view of the individuals as they approach Second Street. This Court did not see any physical confrontation involving the Defendant, Mr. Lampkin, Deputy Mangrum or the other deputy. This is the conclusion of relevant conduct which can be viewed on Government's Exhibit No. 2.

<u>ANALYSIS</u>

40.     The sole basis for the remaining violation alleged in the Superseding Petition is that "the Defendant did commit disturbing the peace, contrary to Florida Statute 877.03." This is Violation Number 2.   It is the only violation remaining since the government announced that it was voluntarily dismissing Violation Numbers 1 and 3 at the outset of the hearing on November 16, 2011.   This Court must analyze the Defendant's conduct observed on Government's Exhibits No. 1 and 2 together with the testimony received during the hearing in light of the applicable law in the State of Florida concerning the disorderly conduct statute. There is an interesting Eleventh Circuit opinion as well as a decision by Judge Hoeveler of this Court in which various Florida Supreme Court and Court of Appeals precedent is discussed in respect to the Florida disorderly conduct statute.

41.     In <u>Gonzales v. City of Belle Glade</u>, 287 So. 2d 669 (Fla. 1973), the Florida Supreme Court stated that a violation of the breach of the peace-disorderly conduct statute requires more than the creation of a mere annoyance.   There must be proof that some act on the part of the accused either corrupted the public morals, outraged the sense of public decency, affected the peace and quiet of persons who witnessed the conduct of the accused, or that the accused engaged in brawling or fighting, or engaged in conduct constituting breach of the peace or disorderly conduct.   In <u>Gonzales</u>, the Supreme Court

14

found that two protest marchers, who had made threatening comments to police officers, did not violate the disorderly conduct statute.  There was no evidence that either of the protestors struck or threatened to strike any of the officers in question.  The court found that the actions of the protestors were a "mere annoyance"  to those around them. The Court found that the threatening comments were protected speech and would not support a charge of disorderly conduct unless accompanied by other physical actions.

42.     In State v. Saunders, 339 So. 2d 641 (Fla. 1976), Justice Hatchett cited the Gonzales decision and once again stated that in the absence of any actions of striking, touching, or offering a physical threat, that mere annoyance to the officer and/or the surrounding community, would be insufficient evidence upon which to base a conviction for disorderly conduct.  Justice Hatchett pointed out that statutes regulating speech must "punish only unprotected speech and not be susceptible of application to protected expression."  Justice Hatchett and the Florida Supreme Court in Saunders limited the application of Fla. Statute 877.03  so that it only applies either to words which "by their very utterance inflict injury or tend to incite an immediate breach of peace."  In conclusion, Justice Hatchett states "we construe the statute so that no words except 'fighting words' or words like shouts of 'fire' in a crowded theater fall within its proscription, in order to avoid the constitutional problem of overbreadth, and 'the danger that a citizen will be punished as a criminal for exercising his right of free speech'."

43.     The Second District Court of Appeals addressed this matter in Miller v. State, 780 So. 2d 197 (Fla. 2nd DCA 2001) and found that there was insufficient evidence to support a conviction for disorderly conduct under Fla. Statute 877.03 when the defendant's conduct consisted solely of loud and aggressive speech in which the defendant directed

the officer to remove her boyfriend from the residence during a domestic disturbance call. The defendant's conduct was entirely verbal, consisting of neither fighting words nor false words that created a clear and present danger of harm to others, and therefore was protected under the First Amendment. Subsequent to her arrest, the defendant committed a battery on the law enforcement officer and the Court of Appeals found that there was sufficient evidence to support that conviction. However, the court found insufficient evidence to support the conviction for disorderly conduct.

44. In Barry v. State, 934 So. 2d 656 (Fla. 2nd DCA 2006), the Court reviewed the disorderly conduct statute, Fla. Statute 877.03. The court pointed out that protected speech, under the disorderly conduct statute, can become unprotected when coupled by a defendant's additional physical actions. However, in Barry, the court found that there was insufficient evidence to support a conviction for disorderly conduct even though the defendant yelled obscenities at the police officer along the roadside where the incident took place. The court noted that motorists traveling along the highway adjacent to where this incident occurred, did slow down or stop to observe the defendant while he was yelling. Nevertheless, the court found that there was no evidence that the defendant's words were fighting words or words that would tend to incite immediate breach of the peace. The court found that the defendant did not engage in any physical conduct toward the officer on the scene which affected the officer's ability to do her job. Further, the court found there was no evidence that there was a breach of the peace or evidence that the defendant committed acts which incited others to act or that anyone in the immediate area was actually incited to engaging in an immediate breach of the peace. The court in Barry cited

16

as authority the Florida Supreme Court's opinion in <u>Saunders</u> referenced by this Court previously herein.

45.     The court in <u>Barry</u> gave examples of how protected speech could become unprotected.  The court pointed out that additional physical actions coupled with otherwise protected speech could be sufficient evidence to sustain a conviction for disorderly conduct.  The court pointed out that a combination of words and actions which hindered an officer's ability to complete an arrest, for example, was sufficient to support a conviction for disorderly conduct.  The <u>Barry</u> court cited <u>Wiltzer v. State</u>, 756 So. 2d 1063 (Fla. 4th DCA 2000), to make a distinction and pointed out that in that case Wiltzer's words in combination with his non-verbal acts of bumping into the police officer, brushing a police officer aside, and throwing his wallet at the officer were sufficient to support a conviction for disorderly conduct. The <u>Barry</u> court pointed out that in <u>Barry</u> there was only evidence that some motorists slowed down to watch the interaction between Barry and the officer. There was no evidence that any of these individuals actually responded to Barry's words or that anyone in the area was actually incited into engaging in an immediate breach of the peace.  The <u>Barry</u> court pointed out that the state had proven, at most, that the onlookers slowed because they were curious or annoyed.   The court pointed out that a "mere annoyance" is insufficient to sustain a conviction under the disorderly conduct statute.

46.     In <u>A.S.C. v. State</u>, 14 So. 3d 1118 (Fla. 5th DCA 2009), the Court of Appeals reviewed Florida law in respect to the disorderly conduct statute and found that it applies only to words which by their very utterance inflict injury or tend to incite an immediate breach of the peace, or to words known to be false, reporting some physical hazard in circumstances where such a report would create a clear and present danger of bodily harm

17

to others.  In <u>A.S.C.</u>, a fifteen year old juvenile was speaking loudly and using profanities. The court found that this was insufficient to constitute disorderly conduct.  The court in <u>A.S.C.</u> referenced the <u>Barry</u> decision and pointed out that the court in <u>Barry</u> found that although the defendant's voice was loud and his language may have been offensive, that there was nothing to indicate that the defendant's conduct incited others to breach the peace or posed an immediate danger to others.  The court in <u>A.S.C.</u> found that the trial court should have granted the defendant's motion for judgment of dismissal regarding a disorderly conduct charge.

47.     The Third District Court of Appeals in <u>Fields v. State</u>, 24 So. 3d 646 (Fla. 3rd DCA 2009) held that the mere fact other people came outside or stopped to watch what was going on was insufficient evidence to support a conviction for disorderly conduct.  The Court held that there must be some evidence that the crowd was actually responding to the defendant's words in some way that threatened a breach of the peace.  The defendant in <u>Fields</u> was yelling into a cell phone and using profanity standing in the doorway of a bank. While his conduct may have been loud and his language found to be offensive, there was no evidence of "fighting words" or any other actions to likely incite the individuals in the immediate area to commit a breach of the peace.  The court noted that the only evidence was that the crowd viewed the defendant out of "curiosity or to observe the defendant's behavior."  The Court of Appeals found the evidence insufficient to sustain a conviction under the disorderly conduct statute.

48.     The final state court decision this Court wishes to cite is <u>C.N. v. State</u>, 49 So. 3d 831 (Fla. 2nd DCA 2010).  C.N. was a juvenile who was accused of shouting and using "foul language."  The Court of Appeals found that the state must establish that the words

either caused a crowd to gather, thereby resulting in safety concerns, or that the words incited a crowd to engage in an immediate breach of the peace.  There was no such evidence in the case. Simply loud and profane language, without more, is insufficient to sustain a conviction under the Florida disorderly conduct statute.

49.     In Stamos v. Brown, 2010 WL 2985659 (S.D. Fla. 2010), Judge Hoeveler reiterated the state court precedent in regards to the Florida disorderly conduct statute, Fla. Statute 877.03.  Judge Hoeveler pointed out that although speech alone can constitute action sufficient to support a charge of disorderly conduct, to avoid First Amendment concerns in cases involving speech, the Florida Supreme Court has strictly limited the law to apply to such cases only where a speech, by its very utterance inflicts injury or tends to incite an immediate breach of the peace.  Judge Hoeveler cited from the Eleventh Circuit Court of Appeals opinion in Gold v. City of Miami, 121 F.3d 1442 (11th Cir. 1997) and to the Florida Supreme Court opinion in Gonzales, supra.  Judge Hoeveler pointed out that there is insufficient evidence to support a conviction for disorderly conduct where a defendant merely directs profane language at a police officer in the presence of others or where a defendant made threatening comments to and voiced intemperate expletives near police officers.

50.     While Judge Hoeveler was dealing with the standard for qualified immunity in a civil context, his opinion references Florida law in respect to the disorderly conduct statute, and makes interesting comparisons in respect to the evidence this Court has before it. Judge Hoeveler points out that in Stamos, the evidence established that Stamos never assumed any threatening stance or even used profanity. Stamos did admit to raising his  voice to a level indicating the firmness of his request concerning what he was asking

19

the officer.  However, there was no evidence to suggest that Stamos' words or conduct incited an immediate breach of the peace.

51.      Finally, in United States v. Lyons, 403 F.3d 1248 (11th Cir. 2005), the Eleventh Circuit reviewed Florida law in respect to the disorderly conduct statute, Fla. Statute 877.03.  In drawing a distinction, the Court of Appeals in Lyons pointed out that when conduct involves something more than mere speech, such actions may constitute sufficient evidence to support a conviction for disorderly conduct.  Examples the Court gave of such non-verbal acts in combination with speech which may constitute sufficient evidence to support a conviction under the disorderly conduct statute were where an individual repeatedly approached a police officer in combination with his speech; where the defendant's conduct during a traffic stop drew a large hostile crowd to the scene of the traffic stop; and where loud abusive conduct continually interrupted an officer's investigation at the scene while ignoring the officer's requests to "wait his turn."

52.      The court in Lyons pointed out that Lyons engaged in more than voicing protected speech.  Lyons not only yelled obscenities and a racial epithet at the officer, but also engaged in non-verbal conduct which included running up to the officer multiple times when the officer was trying to disperse a large crowd of no less than thirty to forty individuals.  The court upheld the trial court's finding that Lyons' conduct interfered with the officer's dispersal attempts in regards to that crowd even though the officer had repeatedly warned Lyons to leave the area ten to fifteen times.

53.      This Court must now review the evidence presented and determine whether under this applicable case law, the acts of the Defendant constituted a violation of the Florida disorderly conduct statute and whether the government has established such a

20

violation by a preponderance of the evidence. In doing so, the Court will summarize the relevant portions of the testimony of Deputy Mangrum and Mr. Lampkin together with what this Court now has observed on Government's Exhibits No. 1 and 2. The Court will then apply those facts to the case law related above.

54.     Deputy Mangrum testified that the Defendant and Mr. Lampkin did not stand when Judge Yacucci entered the courtroom. This Court finds that the videos dispute that fact. The Defendant in a red shirt is seen standing when Judge Yacucci enters the courtroom. The Defendant is then seen standing and leaning towards Deputy Rullo as if to hear what Deputy Rullo was asking him and then sits down again. The Defendant stands a third time when he and Mr. Lampkin were asked to leave the courtroom.

55.     This Court did not observe on Government's Exhibit No. 1 any aggressive attitude or movement by the Defendant towards Deputy Rullo as characterized by Deputy Mangrum's testimony when he stated that the Defendant made an aggressive move toward Deputy Rullo. There is no such aggressive move observed on the video. If Deputy Mangrum characterizes what the Defendant did as an aggressive move, then any movement by an individual leaning towards someone as if to better hear what they are saying, is to be considered to be aggressive. It is not what this Court characterizes as aggressive.

56.     There is no audio of what was being said between the Defendant and Deputy Rullo. Even if this Court accepts what Deputy Mangrum says was profanity coming from the Defendant and the Defendant saying something about a lawsuit, this Court finds that those words in and of themselves do not constitute disorderly conduct under Florida law as cited by this Court herein.

21

57.     Deputy Mangrum testified that when the Defendant and the other individuals were asked to leave the courtroom, he saw the Defendant stand and make a "grilling or growling" action with his face.  The video is not clear enough for this Court to see if the Defendant did anything with his face since it is taken a great distance from the public seating area of the courtroom.  However, this Court does not see how a "grilling" or "growling" facial expression would constitute disorderly conduct or a threat sufficient to be considered non-verbal conduct under the applicable case law as exhaustively reviewed by this Court herein.  Therefore, even if the Defendant was spouting profanities or making a "grilling or growling" facial expression, those actions alone would not constitute disorderly conduct in this Court's view.

58.     Deputy Mangrum testified that on the way to the elevator, the Defendant asked "loudly" what if he did not agree to leave the courthouse.  Again, this Court will accept what Deputy Mangrum testified to as being accurate since there is no audio.  However, when the Defendant is seen to turn and walk with Mr. Lampkin ahead of the deputies towards the elevators, he does not turn around. He is not seen making any comments to the deputies who were following him.  Even if he did, such a comment as described by Deputy Mangrum would not constitute disorderly conduct.

59.     Deputy Mangrum then testified that on the elevator, where there was no video, that the Defendant took "an aggressive stance."  There is no independent evidence for this Court to view of that allegation.  There is only Deputy Mangrum's testimony that such a "aggressive stance" was taken by the Defendant and Mr. Lampkin's testimony that no such action took place on the elevator.  Without more, an allegation of an "aggressive stance" is not found by this Court to be sufficient evidence of disorderly conduct.  This

22

Court is making this determination based upon Deputy Mangrum's characterization of "an aggressive move towards Deputy Rullo" in the courtroom which this Court viewed as merely the Defendant leaning forward towards Deputy Rullo from the second row of the spectator gallery.  If Deputy Mangrum is characterizing that move in the courtroom as "aggressive," this Court seriously questions his concept of what is "aggressive" and this Court is not willing to accept his testimony of an "aggressive stance" in the elevator as being sufficient to constitute disorderly conduct under the case law.

60.     Deputy Mangrum testified that the Defendant and the other individuals were told several times outside the courthouse to leave.  However, when looking at the video, the Defendant and Mr. Lampkin are seen walking out the front door and immediately appear outside in the outer area of the courthouse.  There does not appear to be sufficient time for the Defendant to stop, yell back to the deputies and then be instructed "several times" to leave the area.  It seems to all have flowed at one time on the video.  Further, the video shows the Defendant continuing to walk down the sidewalk towards Second Street. It does not appear that he stops or even turns at any given point.  This Court must admit that as the Defendant walks away, his actions become less visible, as do those of the deputies, as they all walk further away from the camera towards Second Street. Nevertheless, there is nothing which takes place outside the courthouse which falls within the definitions of disorderly conduct discussed by the various state and federal court decisions cited by this Court herein.

61.     There were other individuals outside the courthouse who are not related in any way to this incident.  The two individuals in suits did note the deputies when they walked past following the Defendant and Mr. Lampkin.  These two gentlemen in suits

23

peered around a column for a period of no longer than five to ten seconds and then walked back and continued their conversation.  This Court did not see any members of the public outside the courthouse pay much attention at all to what was going on.  Certainly, there is no evidence that anyone outside the courthouse was incited to commit a breach of the peace by the Defendant's purported actions.

62.     In reviewing Mr. Lampkin's testimony, he testified that the Defendant was slow to rise because of a bad foot, but that he did eventually stand within five to ten seconds of Judge Yacucci taking the bench.  Mr. Lampkin testified that there were no threats or aggressive gestures towards any deputy. This appears to be consistent with what is depicted on the videos reviewed by this Court.  Mr. Lampkin testified that he and the Defendant stood up and then were asked to leave the courtroom.  He denies that there was any profanity or any aggressive gestures by he or the Defendant on the way to the elevator.   This also appears to be consistent with what this Court observed on Government's Exhibits No. 1 and No. 2.

63.     Mr. Lampkin testified that once all of the individuals were on the elevator, Deputy Mangrum purportedly called Mr. Lampkin and the Defendant "punks" and cursed at them.  However, there is no independent evidence of this since there is no video of what may have occurred within the elevator.

64.     Mr. Lampkin testified that once outside the courthouse, Deputy Mangrum yelled at them.  He said Deputy Mangrum was very upset and was "getting red in the face."  Mr. Lampkin did hear the Defendant purportedly say that he was going to report Deputy Mangrum and that the Defendant simply kept walking to his car parked out near Second Street.

65.     In respect to the alleged misidentification of the Defendant by Mr. Lampkin, he testified that he told Deputy Mangrum that the individual who was yelling at him was Tony Smith.  Tony Smith is an acquaintance of Mr. Lampkin and was at the courthouse for an unrelated reason.  Upon seeing what occurred, apparently Tony Smith began yelling something at Deputy Mangrum.  When Deputy Mangrum asked Mr. Lampkin who that was, he told him that it was an individual named Tony Smith.

66.     Deputy Mangrum called back on rebuttal testified that he was not confused and that it was, in fact, the Defendant who was yelling, not someone named Tony Smith. Even if this Court accepts Deputy Mangrum's testimony as being entirely accurate in this regard, there still is not  sufficient evidence to constitute disorderly conduct under the applicable case law.

67.     For argument sake only, assume that the Defendant did use profanity towards the deputies, loudly said that he knew where Deputy Mangrum worked and would get him, and threatened a lawsuit, such verbal conduct is insufficient to constitute disorderly conduct under Florida law. Deputy Mangrum does not allege that there was any physical contact ever made by the Defendant with he or any other deputy.  The only non-verbal acts which even come close to coming within the purview of the disorderly conduct statute would be the "aggressive move" in the courtroom and/or the "aggressive stance" in the elevator.  In reviewing the videos, this Court did not see any "aggressive move" in the courtroom, and based upon that finding, highly questions whether or not there was an "aggressive stance" in the elevator.

68.     Therefore, even if Deputy Mangrum is accurate in all of the verbal assaults upon him by the Defendant, there is no evidence of any "fighting words", physical contact,

or threatening aggressive gestures of impending physical contact which would constitute disorderly conduct under the applicable case law.  Additionally, there is no evidence that anything the Defendant said incited any member of the public to cause a breach of the peace as referred to by the various courts which have interpreted the disorderly conduct statute.  As a result, this Court finds that even by the preponderance of the evidence standard, the government has not established that the Defendant committed disorderly conduct on the day and place alleged in the Superseding Petition.

ACCORDINGLY, this Court recommends to the District Court that the Defendant be found to have not violated his supervised release as alleged in Violation Number 2 of the Superseding Petition and that the matter be dismissed.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** this _____9th_____ day of December, 2011, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. K. Michael Moore
AUSA Theodore M. Cooperstein
AFPD Fletcher Peacock
U.S. Probation